IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2010

## JOSEPH C. CALDWELL, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Putnam County**
**No. 07-0757A     David Patterson, Judge**

---

**No. M2009-01558-CCA-R3-PC - Filed August 5, 2010**

---

The petitioner, Joseph C. Caldwell, Jr., pled guilty to robbery and aggravated burglary, both Class C felonies, and received a negotiated sentence of six years for each charge, to be served consecutively in the Tennessee Department of Correction. The post-conviction court denied the petitioner's post-conviction petition. On appeal, the petitioner argues that his trial counsel provided ineffective assistance of counsel and that he entered his guilty pleas involuntarily and unknowingly. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

John Phillip Parsons, Cookeville, Tennessee, for the appellant, Joseph C. Caldwell, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Randall A. York, District Attorney General; and Beth Willis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Background**

The petitioner, Joseph Caldwell, Jr., pled guilty on May 6, 2008, to robbery and aggravated burglary, both Class C felonies, and received a negotiated sentence of six years for each charge, to be served consecutively in the Tennessee Department of Correction. At

the guilty plea hearing, the state submitted that it would have proved the following, had the case gone to trial.

[On July 25, 2007], Investigator Gary Harris with the Algood Police Department investigated these charges against [the petitioner, Robert Dillon,] and a third co-defendant. What happened on that date was that [the petitioner and Mr. Dillon] went into [the home of] a lady by the name of Patsy Wilson . . . . She was sixty[-]nine at the time[,] and they came in with masks on their face[s] and one of them had a knife in [his] possession. One did more of the talking, one stood in front, one stood in back, but they made some serious threats that they would do bodily harm to her. They tied her up with duct tape, . . . took [$700] in cash from her purse, [and] also some prescription medication belonging to her son.

. . . Detective Harris developed three suspects . . . . [He] [i]nterviewed the third co-defendant, Donnie Lynn, who did give a statement implicating all three of them. Lynn stated that he formulated the plan, told them where Ms. Wilson lived, [and] that she often had money on hand. He thought that only a burglary [would] take place because they didn't expect Ms. Wilson to be home. However, she was in fact home, and these charges arose.

Mr. Lynn never [went] in her house, but . . . he was in the car driven by Mr. Dillon's girlfriend, who also gave a statement implicating the three of them and . . . gave a description of the vehicle that was involved . . . .

. . . Detective Harris found all three of these individuals. [The petitioner] was on probation at the time[,] and his house was searched pursuant to probation conditions. He never gave any type of statement to implicate himself. . . . [H]e did . . . say they were together, but he didn't know anything about a burglary.

Based on the description that Ms. Wilson gave, some mechanics type pants were . . . found in [the petitioner's] possession, along with some workboots that were also described by the victim.

When Mr. Dillon was found at his place . . . a [consensual] search was given [sic] and . . . the vehicle that was believed to be driven this particular night was found at the house and also some medication that . . . matched the prescription medication that was stolen from Ms. Wilson.

The black Jeep Cherokee that was used that particular night was later searched twice. The first time there [were] some gloves found. There [were] also some black stockings that we believe that were used as the masks. And the second time there was a partial duct tape in the Jeep Cherokee that was sent along with the duct tape that was taped to Ms. Wilson at the time to the TBI Crime Lab. Those two matters were tested[,] and the TBI was going to testify that those two in fact were joined at one point in time.

The petitioner filed his original, *pro se* petition for post-conviction relief on September 29, 2008. The post-conviction court found that the petitioner presented a colorable claim and appointed counsel to represent the petitioner. Through counsel, the petitioner filed an amended post-conviction petition on April 16, 2009, which incorporated the first petition by reference. Taken together, the petitions alleged that the petitioner received ineffective assistance of counsel and entered his guilty pleas involuntarily and unknowingly. The post-conviction court held a hearing on June 5, 2009, at which the parties presented the following evidence.

The petitioner testified that he was on probation in Davidson County when he pled guilty to the charges in Putnam County. He was serving his eight-year sentence from Davidson County consecutively to the two six-year sentences from Putnam County. The petitioner testified that counsel visited him at the jail one or two times. He recalled that counsel met with him prior to his preliminary hearing. At the preliminary hearing, the victim tentatively identified him, but the petitioner said that, to his knowledge, counsel never sought to suppress the identification. The petitioner said that the victim testified that he had a beard, but he claimed that he did not wear a beard.

The petitioner testified that counsel shared the state's discovery with him, including the written statements of the state's witnesses, and went over the evidence with him one or two times. Counsel did not show him the DVDs of the state's witnesses giving their statements because the jail's DVD player would not play the discs. The petitioner said that viewing the DVDs was important to his defense because the written statements were in conflict with each other. The petitioner said that one of the DVDs contained the statement of Megan Johnson. He claimed that, according to her statement, he was "at karate" when she and the petitioner's co-defendants were "scoping the house out to hit it . . . ."

The petitioner further testified that he became aware that the state had possible DNA evidence in the case when authorities took a sample of his hair. He stated that he wanted a DNA test performed on the evidence, but counsel told him that he would have to pay for it. The petitioner said that he did not know that counsel could have moved the court for funding to have the evidence tested. According to the petitioner, the state did not perform the DNA

tests because it was too costly, and they had ample evidence aside from any possible DNA. Concerning the state's other evidence, the petitioner said that he never received a copy of a pawn ticket that the state claimed linked him to the vehicle used in the crime. He testified that counsel did not inform him what evidence the state would use against him at trial. He said that he had an alibi for the night of the crime because he and his son had a private karate lesson from 6:30 p.m. until 8:30 p.m., after which they went home. He informed counsel of potential alibi witnesses, and to his knowledge, counsel did not interview them.

The petitioner testified that counsel did not explain to him the concept of "beyond a reasonable doubt." He said that he understood how the trial system worked but believed there was reasonable doubt in his case. The petitioner said that counsel never explained how some of the evidence might rise to the level of reasonable doubt. After counsel successfully moved the court to sever his case from one co-defendant, Mr. Lynn, the petitioner asked him whether being tried with Mr. Dillon would make it more likely that the jury would find him guilty. According to the petitioner, counsel responded that the jury might convict him and that he would receive the maximum sentence. The petitioner said that he asked counsel to get his trial severed from Mr. Dillon's, but counsel did not move for a severance and did not explain his reasoning.

The petitioner recalled that, when he pled guilty, he was under oath and the trial court informed him of his rights. Additionally, counsel informed him of his rights and the range of punishment he could expect to receive if he went to trial. According to the petitioner, counsel told him that he might get up to twelve years for aggravated robbery, six for aggravated burglary, and six for aggravated assault and that the court might run the sentences consecutively. Based on that information, the petitioner decided to plead guilty, believing "it was [his] only option." The petitioner said that counsel did not explain that two of the sentences might merge, and he "was led to believe that they were going to stack all three sentences." He testified that counsel explained that the state could not enhance his offender status to Range II, but he "was also led to believe that [he] could get [85%] if [he] did lose [the] trial . . . ." The petitioner said that if he had known that the maximum sentence he could receive was eighteen years, he would not have pled guilty in exchange for a twelve-year sentence. He said that he told the court during his guilty plea hearing that counsel did "a good job," but at that time, he did not realize that counsel had misinformed him about his possible sentence.

On cross-examination, the petitioner testified that he had three prior felony convictions. He said that he had been on misdemeanor probation for several years because he repeatedly failed drug tests. He further testified that he had pled guilty in other cases. The petitioner said that counsel had either spoken to Mr. Green, the petitioner's karate instructor, or obtained transcripts from police conversations with him regarding the

petitioner's alibi for the night of the crime. The petitioner agreed that counsel filed several motions on his behalf. He further agreed that during the preliminary hearing, the victim testified on cross-examination that she was unsure of her identification of the petitioner.

Jimmy Green, a martial arts instructor, testified that he trained the petitioner. He said the petitioner was a first degree black belt. Mr. Green testified that on the night of the robbery, the petitioner had a lesson with him and was clean-shaven. Mr. Green did not speak with an attorney representing the petitioner, but he gave his class schedule to a police officer.

Diane King, the petitioner's mother, testified that she spoke with counsel by phone after the preliminary hearing regarding her concerns. She also spoke with counsel before the petitioner pled guilty, and he said that he believed the petitioner was innocent but would receive thirty-five years if he went to trial.

Mitchell Caldwell, the petitioner's son, testified that on July 11, 2007, he and the petitioner had a private lesson with Mr. Green. Mr. Caldwell never communicated with counsel in any manner, nor did he speak with the police.

On cross-examination, Mr. Caldwell testified that the private lesson was over at 8:30 p.m., and he was with the petitioner until approximately 9:30 p.m. Mr. Caldwell said that he did not attempt to contact the petitioner's counsel because he did not know counsel's name.

Counsel testified that he had practiced civil and criminal law in Cookeville, Tennessee since 1984. He was licensed to practice in Tennessee in 1980. The general sessions court appointed counsel to represent the petitioner in either August or September 2007. He initially met with the petitioner at the jail and discussed the case prior to the preliminary hearing. At the preliminary hearing, he cross-examined the victim regarding her identification, and he stated that in his opinion "there wasn't a clear identification." After the general sessions court bound the petitioner's case over to criminal court, the criminal court appointed him to represent the petitioner.

Counsel said that he filed a general motion for discovery, and the District Attorney General granted him an open file. He made a copy of everything in the state's file. Counsel testified that his general practice was to present his client with the discovery file and then meet with the client after the client had a chance to read through the file. Counsel recalled meeting with the petitioner more than twice and discussing the case over the phone multiple times. Regarding the DVDs, counsel testified that he arranged to have a television and DVD player available at the jail, and after the first player did not work, they tried a second player, which also would not play the DVDs. While they were unable to watch the DVDs, counsel said that he discussed the witness statements with the petitioner. He testified that he was able

to reprogram the DVDs to work just before the petitioner pled guilty, but he was unable to show them to the petitioner. Counsel testified that on May 6, he was prepared to argue the motions that he had filed, but the petitioner pled guilty that day. Counsel said that he was surprised that the petitioner accepted the state's offer. He testified that the petitioner told him that he had his Davidson County case, which would run consecutive to the sentences in the instant case, "all worked out." Counsel said that he would have moved for funding to pay for a DNA test if the petitioner had not pled guilty, and he did not remember telling the petitioner that he would have to pay for the test. He recalled speaking with Mr. Green by phone because the private lesson might have been an alibi. Counsel tried to contact Megan Johnson, and he was still in the process of contacting her when the petitioner pled guilty. Counsel recalled talking with members of the petitioner's family, including his mother and either a sister or an aunt. He said that the petitioner's mother told him that she thought the investigating officer pointed the petitioner out to the victim prior to the preliminary hearing, which might have been significant had the case gone to trial. Counsel said that he did not "read through the definition of reasonable doubt and have a philosophical discussion [with the petitioner] on whether or not he understood it." Counsel testified that he did not move to sever the petitioner's trial from his co-defendant, Mr. Dillon, because Mr. Dillon did not make a statement against the petitioner. Counsel said that he would have had time before trial to make more motions, including a motion to sever, if the petitioner had not pled guilty. Counsel said that he filed a motion to discover any physical evidence the state had in its possession, which included the pawn receipt if the state had it. Counsel said that he made copies of the charging statutes and sentencing statutes to give to the petitioner and discussed the possible sentence range. They also discussed the possibility that the court might enhance his range because of prior felonies. Counsel said, "I never tell a client that he's going to get a certain number of years. And I know I did not tell [the petitioner] that." Counsel testified that he had an "honest conversation" with the petitioner about the victim's "weak identification" and his co-defendants' statements against him. He recalled telling the petitioner that the state would ask that his sentences run consecutively, but the judge would determine whether his sentences ran concurrently or consecutively. He said that the stacking issue "just didn't come up."

On cross-examination, counsel testified that he was still preparing for trial when the petitioner pled guilty and that the case was not ready for trial at that point. He said that the trial was set for May 22. Counsel said that he had not come across the issue of merger in his years of practice, and he did not discuss merger with the petitioner. Counsel testified that, in hindsight, it would have been wise to research the issue of merger. He said that the petitioner did not plead guilty because he was afraid of a larger sentence but because he had worked out something regarding his Davidson County case.

Following the hearing, the post-conviction court denied relief, finding that counsel's representation "was completely appropriate, completely competent, and . . . beyond that which is usually given to those [who] are charged in this court." Additionally, the court found that the petitioner knew the consequences of pleading guilty and what rights he surrendered by pleading guilty.

**Analysis**

On appeal, the petitioner argues that he received ineffective assistance of counsel based on the following allegations: (1) counsel failed to share DVDs containing co-defendants' statements with the petitioner; (2) counsel failed to request that the state test certain evidence for DNA; (3) counsel failed to move for suppression of the victim's identification of the petitioner; (4) counsel did not interview a material witness named Megan Johnson; (5) counsel did not investigate the petitioner's alibi defense; (6) counsel did not follow up on evidence placing the petitioner in the vehicle used during the crime; (7) counsel misinformed the petitioner as to the state's burden of proof; and (8) counsel misinformed the petitioner as to his potential sentences. Additionally, the petitioner contends that he entered his guilty pleas involuntarily and unknowingly because counsel misinformed him about his potential sentences.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is bound to the post-conviction court's findings of fact unless the evidence preponderates against those findings. *State v. Burns,* 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is *de novo* with a presumption that the findings are correct. *Fields v. State,* 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Id.*

*Ineffective Assistance of Counsel*

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *See also Arnold v. State,* 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland,* 466 U.S. at 688. *See also Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. *See also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. *Strickland*, 466 U.S. at 694. In relation to a guilty plea, the petitioner must show a reasonable probability that, but for the errors of his counsel, he would not have pled guilty and would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Adkins v. State*, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994).

Evaluating counsel's performance from his perspective at the time, we cannot agree with the petitioner that counsel provided ineffective assistance. The petitioner himself, by pleading guilty, stopped counsel's investigation into his case and prevented counsel from making further motions on his behalf. Counsel had more than two weeks remaining before the trial date in which to investigate the case, make contact with witnesses, show the petitioner the DVDs, make motions, and research the law. We conclude that the petitioner has not shown by clear and convincing evidence that counsel's performance fell below an objective standard of reasonableness. Therefore, he is not entitled to relief on this issue.

*Guilty Plea*

When determining the knowing and voluntary nature of the guilty plea, the standard is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). *See also State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). The reviewing court must look to various circumstantial factors, including:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). In order for a guilty plea to be voluntary, the petitioner must have an understanding of the charges against him and the consequences of pleading guilty, including "the sentence that he will be forced to serve as the result of his guilty plea and conviction." *Id.* at 905. A petitioner's solemn declaration in open court that his or her plea is knowing and voluntary creates a formidable barrier in any

subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison,* 431 U.S. 63, 74 (1977).

The guilty plea hearing transcript reveals that the trial court had an extended colloquy with the petitioner. The court asked the petitioner if he understood the terms of his plea agreement, to which the petitioner responded, under oath, that he did understand. He also said that he understood the plea form that he signed. The trial court informed the petitioner that he had the right to plead not guilty, to have a speedy and public trial, to have assistance of counsel, to confront and cross-examine witnesses against him, to compel witnesses to appear in court, to not be compelled to incriminate himself, to testify, and to appeal his conviction or sentence. The petitioner stated that he understood these rights. The court told the petitioner the charges for which he was indicted and what the range of punishment for each charge would be, if a jury convicted the petitioner. He also stated that he understood he was pleading to robbery and aggravated burglary. The petitioner told the court that counsel did "a real good job."

Counsel's testimony, as accredited by the post-conviction court, revealed that he did not tell the petitioner a certain number of years to expect if he lost his trial. Instead, counsel discussed what range of punishment the petitioner could expect and explained that the trial court would sentence him if the jury convicted him. Counsel also testified that in considering a plea agreement, the petitioner was more concerned with his prior conviction from Davidson County than he was with receiving a larger sentence. The petitioner testified that he had previously pled guilty in other cases, but he said that if he had known that two of his sentences would merge, then he would not have pled guilty. The post-conviction court, however, discredited the petitioner's stated motive for pleading guilty and found that the petitioner "did exactly what he wanted to do" when he pled guilty. The record does not preponderate against the post-conviction court's finding. We conclude that the petitioner has not carried his burden of proving that he entered his guilty pleas unintelligently. Therefore, he is without relief as to this issue.

## Conclusion

Based on the foregoing reasons, we affirm the denial of post-conviction relief.

_____
J.C. McLIN, JUDGE